THE PEOPLE, *ex rel.* John Doty, *vs.* CHARLES HENSHAW, County Judge of Genesee County.

The power of the legislature to authorize municipal corporations to bond themselves, in aid of railroad corporations, is conclusively settled in this State, by the court of last resort, as well as by the Supreme Court of the United States.

When the assent of the tax-payers of a town, to the issue of bonds by the town, is manifested in the way prescribed by the legislature, it is irrevocable.

If a petitioner may, at any time, withdraw his assent, it must be before the petition has been acted on by the county judge.

After jurisdiction has been conferred upon the county judge, by presenting a petition signed by the requisite number of tax-payers, representing the requisite amount of taxable property, it is too late for petitioners to withdraw their assent.

THIS proceeding is a common law *certiorari* to review the action of the county judge of Genesee county, touching the application of the tax-payers of the town of

Pavilion to bond that town in aid of the Rochester and State Line Railway Company, under chapter 907 of the laws of the State of New York, passed May 18, 1869.

The facts are briefly these: A majority of the tax-payers of the town of Pavilion, representing a majority of the taxable property, as appeared by the last preceding assessment roll of said town, under the aforesaid statute, on the 23d day of February, 1870, presented to the said county judge their petition, duly verified, praying for leave to issue bonds in aid of said road. The usual order and notice were made and given, and the 11th day of March, 1870, fixed as the day for hearing.

On the 11th day of March, 1870, and while the proofs were being taken, the said county judge allowed twelve of the petitioners whose proper signatures appeared on said petition when the same was deposited with him, to withdraw from said petition, under objection from the counsel for the other of said petitioners. The effect of such withdrawal was to leave less than a majority of the taxable property of said town represented by the remaining signers of said petition; but a majority of the taxpayers remained. These facts the return of the county judge showed.

It was alleged to be error on the part of the county judge in permitting any signer of the petition to withdraw after the petition was deposited, for proof, with him, on the 23d of February, 1870.

*L. N. Bangs* and *Geo. F. Danforth,* for the relator.

I. The statute must be strictly construed and strictly followed, and no powers can be exercised, or act done, which the statute clearly, and by its express terms, does not authorize. This is a proceeding unrecognized at common law, and has no warrant, except by statute. "When summary proceedings are authorized by statute, the effect of which is to divest or affect rights of property, the rule

The People *v.* Henshaw.

holds good that they are to be strictly construed. The power conferred must be exercised precisely as it is given," &c. (*Sedg. on Stat. and Const. Law*, 351.) The facts stated in the petition, and which are to be established on the hearing, are, that the signers constitute a majority of the tax-payers, and represent a majority of the taxable property, as appears by the last preceding assessment roll of the town of Pavilion. The notice required by statute to be given is, that "he will proceed to take proof of the facts set forth in said petition, as to the number of taxpayers joining in such petition, and as to the amount of taxable property represented by them." (*Laws of* 1869, *ch.* 907, § 1.) His duty on the day of the hearing is "to take proof as to the said allegations in said petition; to permit such other tax-payers of said town as may then and there appear before him, and express a desire to join as petitioners in said petition, to sign," (*Id.* § 2;) and to adjudicate the fact, that such petitioners, and those joining on the hearing, constitute a majority of the tax-payers, and represent a majority of the taxable property, as shown by the last preceding tax list, if the fact satisfactorily appears. (*Id.*) These are all the duties which the statute imposes upon the county judge, or authorizes him to perform.

II. When the verified petition was deposited with the county judge, no petitioner had any control over it, or right to intermeddle. His assent was irrevocable. 1. Every person interested has a right to insist that this petition shall remain before the county judge for *all* it represents when deposited. The rights of all parties have become fixed, and there is simply the statutory duty remaining on the part of the judge, "to take proof as to the said allegations in said petition." The statute gives him no control over the petition by way of amendment, alterative or otherwise, except that it allows him on the hearing to permit other tax-payers to join in said petition. The whole proceeding is in the nature of a registered balloting, (*The*

*People* v. *Mitchell*, 35 *N. Y.* 551 to 555,) where no negative is allowed to be represented, for the statute counts every man against it who has not expressed his preference for the measure by signing the petition. In the case cited, the court say, page 555: " The sole question submitted by the legislature to the tax-payers was, whether they chose to consent to the exercise, by the commissioners, of the provisional authority with which they were invested, to subscribe for stock, and issue town bonds for a limited amount, in aid of a public enterprise which so deeply concerned themselves and the community in which they resided. Such a submission was a ready and convenient form of taking a popular vote, where the ballot would be inappropriate, as a mere numerical majority would not suffice, unless it represented also a majority interest on the assessment roll. The statute did not require the consents to be filed or preserved. The result once ascertained, each of them became *functus officio*. They might lawfully have been destroyed by the commissioners, but it seems they were afterwards delivered to the company. Any subsequent alteration or erasure would have been as nugatory as the substitution of a new name on a ballot, after being canvassed in its original form, and after the result of the election had been declared." The petition is required to state, when it is presented, that a majority have signed, and therefore there is but the simple matter of ascertaining, in the statutory way, if such majority have signed. In substance and effect the signing this petition is like signing a preliminary agreement for stock in forming a railroad company. Such signature is irrevocable, while the company is in process of formation. Each signer has the right to insist that every other signature shall remain. (*Lake Ontario R. R. Co.* v. *Mason*, 16 *N. Y.* 451 to 463.) 2. The fact that the statute, by express provision, authorizes other tax-payers, on the hearing, to join in the petition, precludes the idea that, without like express provision,

parties having signed could withdraw on the hearing. "If an affirmative statute, which is introductive of a new law, direct a thing to be done in a certain manner, that thing shall not, even though there are no negative words, be done in any other manner." (*Cook* v. *Kelley*, 12 *Abb. Pr.* 35.) The maxim " *Expressio unius est exclusio alterius*," is peculiarly applicable to questions of statutory construction. (*Morey* v. *Farmers' Loan and Trust Co.*, 14 *N. Y.* 302 *to* 306.) "In statutes, ordinances and written instruments the express mention of one thing implies the exclusion of every other." (*Sill* v. *Village of Corning*, 15 *N. Y.* 297. *Kelso* v. *Tabor*, 52 *Barb.* 125 *to* 129.) The case of *Dewhursts* v. *Fielden*, (7 *Manning & Grang.* 182,) illustrates how closely the rule is applied. The question in that case was a right to be registered as a borough voter—the right to registry depending on the occupancy of "any house, warehouse, counting-house, shop, or other building, either separately or jointly, with any land within such city or borough, occupied therewith by him, the same landlord, of the clear yearly value of not less than £10." A person occupying two buildings, neither of which amounted to a rental of £10, but both to more than £10, claimed registration. Tindal, Ch. J., says, (*p.* 186 :) "The rule *expressio unius est exclusio alterius* is, I think, applicable here, and I cannot see why the legislature should have provided for the joint occupation of a building and land, and not for that of two different buildings, if it had been intended that the latter should confer the franchise." So in the case at bar, it cannot rationally be explained why, on the hearing on the petition, provision should be made for parties joining in the petition, and none for withdrawal, if it was intended that parties having signed should have power to withdraw. 3. It must be borne in mind that this statute nowhere contemplates the expression of a negation. Non-action implies negation, and when a tax-payer passes from a passive to an active state, by signing the petition,

he has done the only act the statute contemplates or authorizes him to do. He can nowhere again express his opposition, for the statute furnishes him no mode for doing it. His dissent was assumed until'he gave his assent, and that assent is irrevocable, except when procured by fraud. In *Starin* v *Town of Genoa*, (23 *N. Y.* 439 *to* 451,) when speaking of the proof requisite to establish the assent of the town to a certain enterprise, the court use this language: "But the fact of such assent was to be ascertained and proved, like any other facts of which the evidence was manifest in writing." By logical deduction we may say, in this case, that the whole evidence, resting in writing, cannot be altered or changed by any party or person, but must stand for what the written evidence establishes or represents. If this be so, then the issuable facts are the genuineness of the signatures, the number of persons signing, and the amount of property represented. In the case, 23 *N. Y.*, at page 452, the court say: "It was incumbent on the plaintiff to prove that the written assent given in evidence had actually been signed by the requisite number of tax-payers designated in the act," &c. On this theory, the duty of the judge was compassed in taking proof of signatures to the petition, for the whole evidence rested in writing. The statute does not authorize the county judge to hear parties signing, on the subject of recantation. They are presumed to have acted deliberately in changing their position from a negative to an affirmative, and that is the only act the statute authorizes the performance of. The act of signing the petition is not the performance of a voluntary revocable act, and when signature is made, it is in the nature of a power executed. The party avails himself of the exercise of a franchise conferred by statute, the the result of which is to create an ultimate liability, and, like every other executed power, is irrevocable as to every other party or thing to which it relates, when once exercised. But for the statute enabling the party to give his

The People *v.* Henshaw.

signature, it could not be made at all. (*Thomson* v. *Lee County*, 3 *Wall.* 327 *to* 330.) Each signature relates to every other signature, and when the requisite number is obtained, the power conferred by statute has been so far exercised, and has become so far operative, as to fix the rights of all parties. The subsequent ascertainment of the fact that the necessary signatures have been obtained does not fix the rights of the parties; that is the mere evidence of the fact; but it is the precedent fact that the signatures have been obtained. In *White* v. *City of Buffalo*, in the manuscript opinion of the general term of the superior court, Buffalo, the court discuss this right of revocation in the exercise of a statutory power, and deny the right, and they sum up the whole matter in a single sentence, when they say: " The statute does not provide for vacillating conduct.(*a*)

(*a*) The case referred to was as follows :

WHITE and FIERO *vs.* THE CITY OF BUFFALO.

The action was brought to set aside the proceedings of the common council in the matter of grading and paving Swan street. The decision involves the point as to the legal effect of a change of opinion on the part of property owners, who first signed a petition for a work which subjects them to an assessment, and who afterwards signed a remonstrance against the same work.

The defendant, the City of Buffalo, has power to cause the streets within its bounds to be graded and paved, and the expense thereof to be assessed upon the lands deemed benefited ; but no such improvement shall be ordered, the expense of which shall exceed $200, except upon the application of a majority of the property holders directly interested therein and residents of said city; nor shall such work be ordered until there shall be presented to the common council, and filed with the city clerk, a certificate, signed by the city assessors, or a majority of them, stating that such application is made by a majority of such property holders, resident in said city, and liable to be taxed or assessed to pay for the same; which certificate shall be conclusive evidence that such application is made by a majority, as required by this section. (*Revised City Charter, title* 8, § 19.)

On the 22d day of June, 1868, an application addressed to the common council of said city, asking said council to order Swan street to be graded and paved, and signed by a majority of the resident property holders interested in such improvement, and the certificate of the city assessors annexed to it, stat-

It is claimed that without other authority than that cited, and upon the well settled rules requiring some steadfastness and certainty in men's actions, the action of the county judge should be held erroneous in permitting these petitioners to withdraw. But the precise case has been adjudicated in this State, in the *Matter of the Taxpayers of the Town of Greene*, (38 *How. Pr.* 515,) where the

ing that such application was made by a majority of the property holders, resident in said city, and liable to be assessed to pay for such work, were presented to the said common council, and filed with the city clerk. The common council, on the said 22d day of June, 1868, referred the said application to a committee. On the 29th day of June, 1868, a remonstrance against said work was presented to the common council, and also a petition signed by some of the persons who had joined in the application for the said improvement, asking that their names might be stricken from said application and added to the remonstrance. The remonstrants, and those who petitioned that their names might be stricken from the application for the work and added to the remonstrance against it, constituted, together, a majority of the resident property holders interested in and liable to be assessed for said improvement. The common council referred the said remonstrance and petition to the committee having in charge the said application for the improvement. The committee subsequently reported in favor of the improvement, and the common council ordered the work to be done. The application for the improvement, and the certificate of the city assessors, were in strict conformity with the requirements of the statute, and conferred upon the defendant the power or jurisdiction to cause the improvement to be made. This was not disputed.

*By the Court,* (MASTEN and VERPLANCK, JJ.) The question is, whether after becoming invested with the power to order the improvement, the defendant was, by the act of some of the applicants subsequently turning remonstrants, divested of that power. We think that the defendant was not divested of the power. The defendant is a municipal corporation, having certain functions of government, and the provisions above quoted requiring an application, in a case like the one under consideration, of a majority of the property holders, is a restriction or limitation upon its general powers. This application and the certificate of the assessors are essential to the power to order a work like the one under consideration; they are jurisdictional essentials. But when an application for the work is made, and the certificate of the assessors is filed pursuant to the statute, and the power or jurisdiction to order the work has thus attached, we do not think that the defendant can be divested of the power, or ousted of its original jurisdiction, without its consent, by the applicants for the work, and much less by only a portion of them.

The People v. Henshaw.

court at general term hold this language : " The authorities are too clear to leave a doubt in my mind that such consent once given, with knowledge of the facts, cannot be withdrawn at the mere will of the person giving his consent." In the same case is cited the manuscript opinion of Justice Gould, in *Mason* v. *Westoon et al.;* and

The object of the application and certificate is to bring into action the general powers of the defendant in the particular cases in which they cannot be exercised without them. When they have done this, their object is accomplished, and the common council thus invested with power, proceeds to execute the work according to its own judgment.

If the statute had not contained the provision in respect to the certificate of the assessors, and its conclusiveness as evidence, the common council would have been under the necessity of determining for themselves whether the application was in fact made by a majority of the property holders, and of acting at their peril upon the correctness of their determination. It being a question of original jurisdiction, would ever be open to inquiry. (*Sharp* v. *Speir*, 4 *Hill*, 88.)

The statute takes from the common council the consideration and determination of the question, whether the application is made by a majority, as required by the statute, and refers the question to another tribunal, and makes its certified determination of the fact conclusive.

It would be against the whole policy of the provision, to hold that the responsibility of determining this question can be shifted from the' assessors to the common council, and thus left open to collateral inquiry, as must be the case, if any portion of the applicants for the work can withdraw their names at pleasure.

The subsequent certificate of two of the assessors, that the remonstrants, and those who petitioned the common council, that their names might be stricken from the application for the work, and added to the remonstrance, were, together, a majority of the interested property holders, was without authority or legal consequence. We mean, upon the question of power. The assessors claim all their powers from the statute, and those they exhausted when they gave the first certificate. It was doubtless the duty of the common council in determining whether the work should be ordered, to consider the wishes of the property holders, and the interest of the public, and the changes, if any, that had taken place. But the power to order 'the work was fixed by the application for it, and the certificate of the assessors.

It was contended on the argument, by the counsel for the plaintiffs, that any of the applicants had the right to withdraw from the application at any time before the work was ordered.

We have already expressed the opinion that they could not do so, without

another case where the justice holds this language : " I am further entirely unable to see that any person who had once signed his name to a written consent, unconditionally, was by either law allowed to change his action, or in any way retract it. The law presumed he would not write his consent unless he meant that he consented, and it

the consent of the council. Indeed, it would seem that those applicants who desired to become remonstrants, so understood it, for they petitioned the common council to change their names from the application to the remonstrance. It was also contended that there must be a majority of the property holders applying for the work at the time it is ordered, and that all changes which may have taken place between the application and the ordering of the work must be considered by the common council ; for it is the policy of the statute that the work is to be ordered only upon the wish of a majority of the property holders interested.

It was, doubtless, the policy of the act, that a work like the one under consideration, should not be ordered by the common council except upon the express wish of a majority of the property holders, for it expressly declares that it shall not be done except upon their application ; but that is not the sole policy of the act. If every property holder liable to have been assessed for the expense of the work had made application for the work, the common council would not have had the power to order it. The statute requires that another tribunal shall adjudge the fact whether the application is made by a majority of the property holders interested, and the certificate of that tribunal that such is the fact, is necessary to the jurisdiction of the common council to order the work.

In this case the applicants submitted their application to that tribunal and obtained from it the adjudication and certificate required by the statute. They had thus judgment in their favor that they constituted the necessary majority. They presented the application and certificate to the common council, and thus, in the way pointed out by the statute, established before the common council, that it was the wish of the majority of the property holders that it would order the work, and satisfied the policy of the statute.

The statute does not provide for vacillating conduct. We are of the opinion that the common council was not, upon the question of power, bound to go back of the application and certificate. The question we are considering is one purely of power, and we have endeavored, in determining its existence, to exclude from our minds all consideration as to whether it has been judiciously executed, for with that we have nothing to do.

The judgment should be reversed and the complaint dismissed, with costs.

CLINTON, J., dissented.

                                        Judgment reversed.

The People *v.* Henshaw.

made no provision for his changing his mind, whether within one day, or one year." It is true, this last case did not arise under the statute of 1869, but it arose under a statute authorizing the obtaining the consent of towns to subscriptions to a railroad corporation, and the scope, or effect, of which was in accordance with the act of 1869. It is claimed, therefore, that this application of the tax-payers of the town of Pavilion should be sent back to the county judge, with directions that he adjudge and determine, upon the proofs already taken before him, that the petitioners do represent a majority of the tax-payers of said town of Pavilion, as shown by the last preceding tax list, or assessment roll, and do represent a majority of the taxable property upon said list, or roll; and that he enter such judgment in conformity with said chapter 907 of the law of 1869.

*M. H. Peck*, for the defendant.

I. The writ of *certiorari* should be quashed. The relator shows no right to prosecute the same. He represents no party to the proceeding before the county judge— neither the petitioners, the railroad company, nor the town of Pavilion—and as an individual, he has no peculiar interest to protect, or injury to redress. (*Matter of Mount Morris Square*, 2 *Hill*, 14. 3 *Abb.* 232. *Doolittle* v. *Sup. Broome Co.*, 18 *N. Y.* 155. *Roosevelt* v. *Draper*, 23 *id.* 318.)

II. The act of the legislature under which this proceeding was instituted (*Laws of* 1869, *ch.* 907,) is unconstitutional and void. The legislature has no constitutional power to authorize the appropriation of private property for private purposes, against the consent of the owner— with or without the consent of his neighbors.

III. Upon the merits, the decision of the county judge was manifestly correct. A brief reference to former legislation and adjudication, relating to the bonding of munici-

palities for railroad purposes, will render the correctness of the proposition more apparent. It is not one of the inherent powers of a town to subscribe for stock, or invest in the bonds of a railroad company. (1 *R. S.* 813, *5th ed. Starin* v. *Town of Genoa*, 23 *N. Y.* 439. *Town of Duanesburgh* v. *Jenkins*, 46 *Barb.* 294.) The legislature of this State has assumed that it possessed the constitutional power to authorize such an appropriation, by a town, of the property of its citizens, and upon that assumption, has, during the past twenty years, enacted various statutes having that end in view, for the benefit of sundry railroad enterprises. It has not, however, as yet been contended by any one, that the legislature possesses any compulsory power in the premises. It is entirely optional with the town to accept or reject the proffered authority, and without acceptance on the part of the town, such authority has no vitality, or practical utility. (*Town of Duanesburgh* v. *Jenkins, supra.*) The acceptance by the town is to be determined by the affirmative decision of a majority of its tax-payers, representing a majority of its taxable property, as shown by the last preceding tax list, or assessment roll. Thus far, in the course of legislation upon this subject, no embarrassment appears to have existed in carrying into practical effect this theory of legislative power. But the difficult question to be disposed of has been, as to the more appropriate and satisfactory method of indicating the decision of the tax-payers, and ascertaining what their decision really was. Under the former statutes, this decision was indicated by the signature of the tax-payer to an instrument, giving direct and express authority to certain persons therein designated, to borrow money on the credit of the town, to be appropriated for the benefit of the proposed railroad enterprise, and to issue binding obligations upon the town for its re-payment. And the fact that such authority had been given by the requisite majority, was left to be ascertained and established by

certain ex parte affidavits and certificates. The Court of Appeals held, in *Starin* v. *Town of Genoa*, (23 *N. Y.* 439,) and *People* v. *Mead*, (24 *id.* 114,) that the actual consent of a majority of tax-payers, &c., was an "absolute prerequisite and condition precedent," to the exercise of any authority by the persons designated, and that this fact must be affirmatively established by competent evidence. This doctrine necessarily results from the principles to which we have already referred, and rests upon the distinct theory that no such obligation can be imposed upon, or assumed by, a town without an actual *bona fide* decision of a majority of its tax-payers, representing a majority of its taxable property. We may now intelligently consider the provisions of the act of 1869, and their legitimate construction as bearing upon the question in controversy. Based upon the same general principles as the previous legislation, this act, nevertheless, effects a radical change in the *modus operandi* by which the legislative authority is to be accepted, and the fact of such acceptance established. Under this statute, the town becomes the actor, and such of its tax-payers as may be in favor of the project, assume the attitude of petitioners, who desire that the town shall create and issue its bonds, and to that end request that the necessary statutory proceedings may be taken by and before the county judge. And the county judge is invested with authority to take proofs and adjudicate upon the questions involved in such application, and consequent upon a judgment in its favor, to set in motion the requisite machinery to render it effectual.

Now the important question arises—what is the precise legal status of the petitioners on the presentation of this petition ; what obligations have they assumed and what rights do they possess as affecting further proceedings in the premises, and what is the nature of the duty devolved upon the county judge in the hearing and determination

of the matter submitted for his consideration? We submit that the precise question to be determined by the county judge is, does the town accept the legislative authority conferred, and desire to exercise it for the benefit of the proposed road? And this inquiry necessarily relates to the point of time when it is to be judicially answered. Such is the language of the statute: the judge is to be satisfied that the petitioners do represent a majority of tax-payers and taxable property, and he so adjudges and records the fact. Not the persons who occupied the position of petitioners three months prior to such adjudication, but those at the time, thus desiring and requesting that such bonds may be created and issued. The construction contended for by the relator not only converts the county judge into a mere "magic calculator," clothed with authority to make certain mathematical calculations, and deliberately to record the result in the form of a judgment, but it completely distorts the action of the petitioners, and nullifies the fundamental principle, that no such obligation can be imposed upon, or assumed by the town, against the wishes of a majority of its tax-payers, representing a majority of its taxable property. For, if we assume that the request made by the act of signing the petition is final and conclusive upon the action of the tax-payer, and he is absolutely foreclosed against repentance, or revocation, it necessarily follows that this burden may be forced upon the town by the action of a single tax-payer, although every other may distinctly and emphatically protest against the same! Such a construction was never contemplated by the legislature; it is repugnant to common sense and common justice, and can never commend itself to judicial approval, or sanction. The fallacy of the argument in its favor consists in the assumption, that by the act of signing the petition the subscriber enters into any sort of contract, with any person. The act bears no analogy to an agree-

ment to take stock. .There is not only no agreement to that effect in the instrument, but the subscriber never expects, or intends, to have any stock. No party to the proceeding is authorized to sell, or transfer stock, and there is no imaginable consideration for any such agreement. The cases which hold that the subsequent creation of the " party of the second part," cures this defect of want of mutuality, and the imaginary benefits to enure to the subscriber as a member of the organization furnish a sufficient consideration for the agreement, go quite as far as is desirable in that direction. (*Buff. & N. Y. City R. R. Co.*, v. *Dudley*, 14 *N. Y.* 336.) In the case cited, it is said, (*op. of Selden, J., p.* 353,) that when a subscription is made to the capital stock of a corporation not yet existing, the law raises, by implication, a promise on the part of such corporation the instant it comes into existence, to invest the subscriber with a share of its property and franchises, corresponding to the amount of his subsciption. But here there is no subscription, and it is left entirely optional by the provisions of the statute, with the railroad company, whether to sell, or transfer, a dollar's worth of stock, or bonds, to the commissioners representing the town, or not. Judge Selden expressly concedes, that such a subscription, tested by the rules of the common law, might be withdrawn, or revoked, at any time prior to its acceptance by the corporation. (*Pages* 352, 353.) The statutory provisions to which he refers, have no bearing upon the question of revocation in the case at bar. We insist that the instrument presented to the county judge in this case is, precisely what it purports to be—a simple petition, and the persons subscribing the same are simply petitioners— setting forth certain alleged facts, and requesting that certain ulterior proceedings may be had as provided by the statute. As such they had an undoubted legal right to withdraw their request at any time before a final adjudication of the matter set forth in the petition, the same

as a petitioner to the legislature, or other municipal body for relief, redress, or favor; a petitioner to the court for some legal remedy, or authority to act in a given case, as one who submits a proposition for the purchase, or sale of property, before acceptance; as one who offers to invest another with authority to act in his behalf as agent, attorney, or otherwise, before assent is given thereto by the other; as one who revokes an arbitration before submission; in fine, as in every conceivable case of request, or proposition before final action, or acceptance.

It does not aid the relator's position to treat the signing of the petition as a "ready and convenient form of taking a popular vote." There is no abstract restriction upon a voter's right to change his vote. In the case of a vote by ballot he may not do so, for the simple reason that it is impracticable, owing to the impossibility of identifying the particular vote cast by him. But it is the constant practice in *viva voce* votes, for any voter to change from one side of the question to the other at pleasure, at any time before the result is formally announced. Of course, there is no difficulty in the case of a petition in identifying the signature of a petitioner, or the amount of taxable property he represents.

Neither do the *dicta* of judges under the former statutes furnish any satisfactory authority upon this question. Whether sound or not, two very plausible arguments existed against the right of a taxpayer to withdraw his "consent" as then given. (1.) It gave *direct* authority to the persons named to act. (2.) No instrumentality was provided by which desire to do so could be manifested or carried into effect.

Again, the provisions of the act of 1869 plainly contemplate that withdrawals may be made. It would be superfluous to give to the petitioners, in terms, the right to do that which they were already legally authorized to do; that is, to withdraw their signatures from the petition. But

The People *v.* Henshaw.

the power to add thereto would not exist unless expressly conferred; hence it is given in terms. This provision very clearly indicates that the legislature contemplated changes subsequent to the signing and presentation of the petition, and that the facts were to be determined as they were found to be at the time of the final hearing and decision. If the presentation of the petition to the county judge was intended in any sense to conclude the rights of the parties in favor of, or opposed to, the application, then, manifestly, it should be conclusive upon both. That it was not so intended is further apparent from the fact that if it should turn out that the petition did not then embrace one quarter of the tax-payers or taxable property, the application might nevertheless be granted, provided the deficiency was subsequently supplied. It is obvious, therefore, from the provisions of the act itself, that in taking this "popular vote" it was intended that the "polls" should be kept open, to enable the voters to give a fair and deliberate expression to their views and wishes upon the question to be passed upon by the county judge, until the conclusion of the "trial" before him, whereby he would be able to render an intelligent and satisfactory decision as to the acceptance or rejection by the town of the legislative authority conferred.

The action of the county judge in this proceeding is clearly of a judicial character, and whether he acts as a court or a judge is not of any moment. The duty is not ministerial in any sense, nor could it be, with equal propriety, devolved upon a "county clerk." The legislature do not confer upon such officers the power to dispose of questions of fact by rendering and recording "judgments," which "shall have the same force and effect as other judgments and records of courts of record of this State." (§ 2.) If the views already suggested are correct, the right of the judge to permit the withdrawal of names is unquestionable.

The petition is to set forth, among other things, the fact that the petitioners "desire that such municipal corporation shall create and issue its bonds" &c., (§ 1;) and the county judge, on the hearing, is required to "take proof as to the said allegations in said petition." (§ 2.) In no proper sense can a party who opposes such action on the part of the town, be said to "desire" that it be had. He cannot, therefore, with any propriety, longer be called a "petitioner." At what point of time, prior to the final adjudication of the judge, can it be said that there is a concurrence of minds among the petitioners? The subscriptions may extend over a period of several months, and many changes in the mean time occur, and influences exist, effecting a radical change in the "desire" of some portion of the petitioners.

IV. Finally, we submit that this statute should be construed as a whole, having in view the intent of the legislature and the purpose sought to be accomplished. The policy of this species of legislation is, to use the mildest expression, very questionable. Practically its results are disastrous to the business interests of those who are deluded into an investment in these numerous railroad enterprises; and no "strained construction" should be resorted to by the courts, which shall have the effect to enhance the evil beyond that which is produced by the voluntary action of the citizen.

*By the Court.* The power of the legislature to authorize municipal corporations to bond themselves in aid of railroad corporations is conclusively settled in this State by the court of last resort, as well as by the Supreme Court of the United States.

The mode in which the tax-payers of a town shall manifest their assent to the issue of bonds, rests entirely in the discretion of the legislature; and when that assent is manifested in the way prescribed, it is irrevocable.

The People *v.* Henshaw.

Each petitioner is, to a certain extent, influenced by the action of every other who has signed before him, and it would operate unjustly to permit any to withdraw, whose consent, manifested by signing the petition to the county judge, has been given.

If the petitioner may at any time withdraw his assent, it must be before the petition has been acted on by the county judge.

If it has been signed by the requisite number of tax-payers representing the requisite amount of taxable property, jurisdiction has then been conferred on the county judge to issue the order. calling before him those whose names are signed to the petition; it is then too late to withdraw. If it could be done at that stage of proceedings, we perceive no reason why it may not be done at any time before the actual issue of the bonds.

We are of opinion that after the county judge has acted on the petition it is too late for a petitioner to withdraw his assent.

. The order of the county judge is reversed.

[FOURTH DEPARTMENT, GENERAL TERM, at Buffalo, June 21, 1870.  *Mullin,* P. J., and *Johnson* and *Talcott,* Justices.]